FILED

2021 Apr-02  AM 11:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOSHUA HARRIS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:15-cv-00461-AKK** |
| **ROYAL CUP, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Ternisha Lowe filed this action against Royal Cup, Inc., alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981"). Doc. 1 at 8. Lowe also pleaded state tort claims of invasion of privacy, intentional infliction of emotional distress, and negligent retention, supervision, and training. *Id.* at 9–10.[1] The court has for consideration Royal Cup's motion for summary judgment, doc. 57, which is fully briefed, *see* docs. 58; 69; 70, and ripe for review. For the reasons explained below, the motion is due to be granted.

---

[1] Lowe voluntarily dismissed her Title VII sexual harassment claim. Doc. 69 at 4 n.1.

## I.

Under Fed. R. Civ. P. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant, who must "go beyond the pleadings" to establish a "genuine issue for trial." *Id*. at 324 (quotation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court construes the evidence and all reasonable inferences arising from it in the light most favorable to the non-movant. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). Any factual disputes will be resolved in the non-movant's

favor when sufficient competent evidence supports the non-movant's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002). But "mere conclusions and unsupported factual allegations" cannot defeat summary judgment. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam). Instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## II.

Lowe, an African American female, has worked for Royal Cup since 1998, with an interlude from 2005 to 2008. Doc. 59-1 at 6–7. In 2008, Lowe returned to Royal Cup and assumed her prior position as an OP-1 machine operator under Eric Farley's supervision. *Id.* at 7; Doc. 59-3 at 3. In July 2009, Lowe "progressed" to an OP-2 position and received a pay increase from $9.00 to $9.50 per hour. Doc. 59-3 at 3, 11. Then, in September 2009, Lowe received an annual merit increase to $10.50 per hour. *Id.* at 3, 13.

## A.

By September 2011, Lowe advanced to the level of OP-3. *See* doc. 59-1 at 11. In November 2012, Royal Cup implemented a new hierarchy for its operators. Docs. 59-1 at 8–9; 59-3 at 15–35. The company created a fourth tier of operators—OP-4A and OP-4B—consisting of employees who were certified to operate certain critical machines. Docs. 59-3 at 3–4, 21–25. Royal Cup placed in the OP-3 tier any

employee who was training to certify as an OP-4. *Id.*; *see also* doc. 59-1 at 11. In December 2012, Lowe signed up to train for the OP-4A certificate required for consideration for OP-4—thereby becoming an OP-3A under the new hierarchy— and her pay increased from $10.61 to $10.80 per hour. Docs. 59-1 at 9; 59-3 at 4. The certification period is six months and, generally, employees selected for an OP-4 slot receive additional pay (i.e., in Lowe's case, the increase to $10.80) during that six-month period. Docs. 59-1 at 13; 59-3 at 4. However, Lowe claims that she did not receive the additional training pay until 2014. Doc. 59-1 at 13, 15. Roughly four months into the training program, Royal Cup moved Lowe from an OP-3A position to an OP-2 position, because, according to Eric Farley's report, "Ternisha decided she did not want to become an OP4A." Docs. 59-1 at 14; 59-2 at 92, 99. This demotion also reduced Lowe's pay rate from $10.80 to $10.61 per hour. Docs. 59-2 at 92; 59-3 at 4.

In January 2014, Lowe expressed concern to Mark Kirkendall, the Human Resource Manager, and Tom Burris, the Operations Manager, that, as an OP-2, she was working the "Whole Bean" critical machines targeted for OP-3 and OP-4 operators without the pay for doing so. Doc. 59-2 at 99, 101. Kirkendall explained that Lowe was asked to operate the Whole Bean line, when needed, after returning to the OP-2 position and that because her pay rate was already above the pay range

for an OP-2, "she did not qualify for and did not receive a pay raise during the next round of merit interviews." Doc. 59-3 at 5.

Lowe believed she should have received "training pay" "based on the machines she was running." Doc. 59-3 at 5. She "complained that two white employees," Rhonda Jones and Renee Cheney, were treated more favorably despite also failing to complete the OP-4 training program. Docs. 59-1 at 17; 59-3 at 6. However, Royal Cup explains that Jones sustained an injury while training as an OP-3 for the OP-4 role and that it therefore suspended Jones' training and extended her time to certify as an OP-4 without reducing her pay. Doc. 59-3 at 6, 40. As to Cheney, Royal Cup explains that her pay did not increase when she chose to train as an OP-3 for the OP-4 role, because it "was higher than the maximum rate for an OP3," *id.*, and that when Cheney similarly opted out of OP-3 training to return to OP-2, "[s]he received the same pay rate that she had previously received as an OP2, just as Ms. Lowe did, per the Company's guidelines." *Id.* at 6–7, 40. Moreover, Royal Cup notes that Cheney "has a permanent job accommodation (weight restriction) that prevents her from running the Whole Bean line." *Id.* at 7, 40.

In February 2014, Farley promoted Lowe from the OP-2 position to OP-3B first shift, increasing her pay from $10.61 to $11.13 per hour. Doc. 59-2 at 93. In September, Lowe earned a pay raise from $11.13 to $11.47 per hour, *see id.* at 94, and then in October, Royal Cup promoted Lowe to the position of an OP-4B and

raised her salary from $11.47 to $12.77 per hour. *Id.* at 96. By September 2015, Lowe's salary had increased to $14.69 per hour. *Id.* at 97.

**B.**

According to Lowe, OP-1, OP-2, OP-4A, and OP-4B operators must be able to lift up to 60 pounds, and operators that work lines 21 and 26 must occasionally lift boxes weighing 30 pounds. Doc. 69 at 7. The job descriptions for these positions state that OP-1 and OP-2 operators "must be able to frequently lift and/or move full cartons/other materials (up to chest high level) that weigh from 3-32 pounds." Doc. 59-3 at 43. Similarly, OP-4A and OP-4B operators must "[b]e able to frequently lift and/or move full cartons/other materials (up to chest high level) that weigh from 3-60 pounds (with assistance if needed)." *Id.* at 45, 47. Allegedly, Royal Cup assigned African American women to lift the heaviest boxes more often than white women. Doc. 59-1 at 17, 30–31. Lowe attributes these "unfair lifting" assignment decisions to Farley and says that nothing was done despite her complaints to HR and Farley. *Id.* at 31.

Additionally, Lowe alleges that Farley refused to address African American employees by their names, using instead "hey you" and "y'all." *Id.* at 18, 30. Moreover, Lowe alleges that Farley made inappropriate and derogatory comments to African American employees. Doc. 69 at 7. Specifically, when Lowe requested leave to take care of her son, Farley once responded, "y'all always is people with

terminal[ly] ill children." Doc. 59-1 at 18. Also, Farley allegedly joked that African Americans had a special affinity for pork and that "they eat the pigtail, root a toot tootle." *Id.* at 33. Farley was also known to have "said the N word," *id.* at 32, and monitored the "comings and goings" of African American employees more closely by, for example, tracking when they used the restroom. *See id.* at 31.

## C.

In January 2014, during an investigatory interview about another employee's allegations against Billy Bishop, a white manager, Lowe reported that Bishop once stated that he wanted to make an "oreo" sandwich out of Lowe, another African American female, and himself. *See* docs. 59-2 at 100; 59-3 at 5. On another occasion, Bishop asked Lowe if she liked "white meat" "in [her]." Doc. 59-2 at 100. Allegedly, Bishop also sent an inappropriate picture to another African American female employee and he was "touchy feeling with you, like he—he always had to touch you, stand behind you." Doc. 59-1 at 23. Additionally, Bishop leered at Lowe, asked how her hair looked down, stared when she bent over, and looked at "[her] breast, between [her] legs." *Id.* at 24.

## III.

Lowe alleges racial discrimination under Title VII and § 1981, *see* doc. 1 at 7, and state law claims for invasion of privacy, intentional infliction of emotional distress, and negligent retention, supervision, and training, *see id.* at 7–11. The court

will address these claims below, beginning with the race claim.

## A.

Because Title VII and § 1981 claims "have the same requirements of proof and use the same analytical framework, [the court] shall explicitly address [Lowe's] Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). The court thus applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for Lowe's race discrimination claim since this is a circumstantial evidence case. The *McDonnell Douglas* framework first "requires the plaintiff to create an inference of discrimination through her *prima facie* case." *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1347 (11th Cir. 2007). If the plaintiff satisfies her initial burden, "then the defendant must show a legitimate, non-discriminatory reason for its employment action." *Burke-Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006). A defendant "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527 (11th Cir. 1997) (quotation omitted). Moreover, the defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus." *Id.*

If the defendant meets this burden, "then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Burke-Fowler*, 447 F.3d at 1323. That is, the plaintiff must produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at1528. In other words, a plaintiff must show that the defendant's proffered reasons were pretextual—that race, in fact, motivated the defendant's decision. *Harrell v. Ala. Dep't of Educ.*, 342 F. App'x. 434, 436 (11th Cir. 2009). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer*, 509 F.3d at 1347.

## 1.

Lowe claims that Royal Cup maintained a general environment of racial discrimination, citing her failure to receive the appropriate training pay increase and the way white managers addressed African Americans and assigned them to daily jobs.[2] *See* doc. 1 at 6–8. She alleges that she did not receive the additional training

---

[2] Although Lowe also claims that Royal Cup discriminated against her by failing to promote her, *see* doc. 1 at 6–8, she does not rely upon these grounds in opposing summary judgment. *See* docs. 58; 69. Therefore, this argument is deemed abandoned. *See, e.g.*, *Edmondson v. Bd. of Trustees of Univ. of Ala.*, 258 F. App'x 250, 253 (11th Cir. 2007) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) (noting that the "district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of summary judgment motions.").

pay Royal Cup guaranteed employees enrolled in the OP-4 training program in late 2012. Docs. 59-1 at 13; 59-3 at 4.[3] Moreover, after leaving the training program in April 2013, Lowe's salary decreased to her pre-training program pay as an OP-3 even though she returned to an OP-2 position. Lowe maintains that she continued doing OP-4 work and that her responsibilities did not change despite her demotion. Allegedly, Royal Cup treated two Caucasian employees—Jones and Cheney—more favorably, despite their failure to complete the OP-4 training program as well, by not reducing their pay or assigning them to run the OP-4 machines. Docs. 59-1 at 17; 59-3 at 6.

Royal Cup challenges Lowe's *prima face* case as to the additional training pay claim. In particular, Royal Cup maintains that Lowe fails to show that Jones and Cheney are similarly situated to her or that it treated them more favorably. Doc. 58 at 20–21. To support this contention, Royal Cup notes that, unlike Lowe, Jones did not leave the training program but instead received extended time to finish her

---

[3] It is unclear to what additional pay Lowe believes she is entitled. Doc. 59-1 at 11. In December 2012, Lowe received a raise from $10.61 to $10.80 because of her enrollment in the OP-4 training program. Docs. 59-1 at 9; 59-3 at 4. Lowe fails to provide the court with evidence of the funds Royal Cup purportedly withheld from her—for example, whether Royal Cup failed to pay her the additional $0.19 per hour or whether she is referring to some other training pay program. *See generally* docs. 1; 69; 59-1. Lowe also states that, although she received the increase much later than she should have, she ultimately received it in 2014, and she has offered no proof that racial animus factored into that decision. Doc. 59-1 at 15. Moreover, records show that existing OP-3's and OP-4's who enter the six-month certification program to become an OP-4A or OP-4B "will retain their current pay rate" but "will be coded as an OP2 for future raise consideration" if they "do[] not certify." Doc. 59-3 at 27. Thus, to the extent Lowe is referring to the reduction of her salary when she left the training program in 2013, she has failed to show any discriminatory conduct.

training because she "experienced an on-the-job injury (while she was training as an OP3)." Doc. 59-3 at 6, 40. Royal Cup thus suspended Jones' "training and extended the time for her to certify as an OP4," which is why it did not reduce her pay. *Id.*

As to Cheney, Royal Cup did not increase her salary when she chose to train as an OP-3 for the OP-4 role because "her pay rate was higher than the maximum rate for an OP3." *Id.* Thus, when Cheney reverted back to the OP-2 classification, Royal Cup had no need to reduce her pay because it had not increased when she joined the program: "She received the same pay rate that she had previously received as an OP2, just as Ms. Lowe did, per the Company's guidelines." *Id.* at 6–7, 40; *see also id.* at 27 (noting that OP-3's and OP-4's who enter the six month certification program to become an OP-4A or OP-4B, "will retain their current pay rate" but "will be coded as an OP2 for future raise consideration" if they "do[] not certify").

Moreover, regarding the OP-4 line that Lowe was assigned to after she left the training program, Royal Cup explains that Cheney cannot run the OP-4 line, because she "has a permanent job accommodation (weight restriction)" that prevents her from doing so. *Id.* at 7, 40. Lowe, in contrast, "is not on any weight restrictions and did not request any accommodations." *Id.* at 7.

Lowe offers nothing in return to challenge Royal Cup's contentions about Jones and Cheney. Instead, Lowe alleges only her general contention that Jones and Cheney received "training pay while attempting certification." Doc. 69 at 11. But

Lowe fails to present any evidence supporting these allegations, and "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis*, 432 F.3d at 1326. In sum, Jones, who is still in the OP-4 training program, and Cheney, whose salary never increased upon entering the OP-4 program and whose weight restrictions limit the machines she can work on, are not similarly situated individuals for the purposes of this discrimination claim. Therefore, Lowe has failed to make a *prima facie* case.

## 2.

The court next considers the alleged discriminatory treatment in work assignments—namely, that Farley assigned African American women to lift heavy boxes more often than white women. *See* doc. 59-1 at 17, 113. Royal Cup argues that: (1) Lowe has not specifically pleaded any facts regarding lifting heavy boxes in her Complaint but only raised the claims for the first time during her deposition; (2) lifting boxes is a requirement of Lowe's job and one that is neither serious nor material; (3) Royal Cup is unaware of any machine operator, including Lowe, on lines 21 and 26 that "has ever been required to lift a box outside of his or her job description"; (4) the "vast majority of boxes weigh less than 30 pounds"; and (5) Farley, whom Lowe "blames for her work assignments, has not regularly prepared the schedule of work assignments for machine operators in approximately three and a half years (since September 2013)." Doc. 58 at 21–23. Moreover, Royal Cup states

that Lowe cannot establish a *prima facie* case of race discrimination "with regard to performing the duties of her job, much less demonstrate that any action taken was pretextual for discrimination." *Id.* at 23.

To begin, Royal Cup is correct that Lowe does not specifically address this claim in her EEOC Charge, doc. 1-1 at 13–14, or in her Complaint, doc. 1. Accordingly, this claim fails because Lowe did not exhaust her administrative remedies.[4] And even if she had, Lowe attributes these assignment decisions to Farley. Doc. 59-1 at 31. But Royal Cup's Human Resource Manager states that Farley has not "regularly prepared" the work schedule for machine operators since September 2013, doc. 59-3 at 8, and Lowe failed to challenge this contention in her brief.

Summary judgment is also due based on Lowe's failure to establish a *prima facie* case. In particular, although Lowe identifies several African American women who she claims, like her, are allegedly assigned to lift heavier boxes than Caucasian women, Lowe's only supporting evidence is her own testimony. Lowe offers no evidence from these women to show that they agree with her that they in fact are receiving purportedly "unfair lifting" assignments. Nor does Lowe offer any

---

[4] *See Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) ("Prior to filing a Title VII action, however, a plaintiff first must file a charge of discrimination with the EEOC" and "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.").

corroborating testimony from anyone else on this point. *See generally* docs. 1; 69. Facts, not "unsupported speculation" or conjecture, are necessary to defeat summary judgment. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quotation omitted).

Finally, Lowe fails to show that assigning African American women to lift heavier boxes more often than Caucasian women constitutes adverse treatment when lifting boxes fits within their job description and Lowe does not assert that Royal Cup requires African American women to lift weights that exceed their job responsibilities. *See* docs. 1; 69; 59-3 at 43, 45, 47 (listing the lifting requirements for machine operators). Lowe counters that Farley "discriminatorily assigned [these] work assignments" in violation of § 703(a)(2) of Title VII, and that "[a]ctionable employer conduct need not be economic or tangible; nor must it inflict serious psychological harm before Title VII comes into play." Doc. 69 at 15. But, "[a]lthough the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001):

> [T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment

action must be materially adverse as viewed by a reasonable person in
the circumstances.

*Id.* Because lifting boxes within a specific weight range is a component of their job

responsibilities, allegedly assigning Lowe and other African American women to lift

heavy boxes more often than white women does not constitute a "material change in

the terms, conditions, or privileges" of their employment and is not "materially

adverse as viewed by a reasonable person in the circumstances." *Id.* Thus, based on

this record, the court "cannot say, under the circumstances, that [a supervisor's]

sporadic assignment of additional tasks to [the plaintiff] outside his job title caused

[the plaintiff] any tangible harm or was an 'unusual instance' in which a change in

work assignments is sufficiently material and substantial to constitute an adverse

employment action." *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 609

(11th Cir. 2008).

For all these reasons, Lowe's racial discrimination claim based on

discriminatory work assignments fails.

**B.**

The court next turns to Lowe's state law claims for invasion of privacy,

intentional infliction of emotional distress, and negligent retention, supervision, and

training. Doc. 1 at 9–10.

## 1.

Lowe contends that her manager Billy Bishop invaded her privacy and proximately caused her to suffer emotional distress and trauma. *Id.* at 9. She adds that Royal Cup "condoned, authorized, and/or ratified Bishop's conduct" because it knew of his behavior and "his history of being sexually inappropriate with [her] and failed to stop it." *Id.* The court construes Lowe's invasion of privacy claim as one based on the "species of invasion known as a wrongful intrusion into one's private activities." *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986). Alabama law defines this tort as "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Id.* "[S]evere sexual harassment can be an invasion of privacy." *Armstrong v. Standard Furniture*, 197 F. App'x 830, 834 (11th Cir. 2006) (citing *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989)).

"For an employer to become liable for the intentional torts of its agent, the plaintiff must offer evidence that (1) the agent's wrongful acts were in the line and scope of his employment; or (2) that the acts were in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts." *Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992) (cleaned up). Lowe argues that Royal Cup "condoned, authorized, and/or ratified Bishop's conduct because it knew of his continuing invasion of [Lowe's] . . . privacy by him

and of his history of being sexually inappropriate with [her] and failed to stop it."
Doc. 1 at 9. Notably, "an employer's failure to stop the tortious conduct after it learns
of the conduct will support an inference that the employer tolerated the conduct."
*East Ala. Behavioral Medicine, P.C. v. Chancy*, 883 So. 2d 162, 170 (Ala. 2003)
(quoting *Potts*, 604 So. 2d at 400).

Lowe did not report Bishop's alleged conduct until Royal Cup interviewed
her in January 2014 about another woman's allegations of sexual harassment against
Bishop. Docs. 59-2 at 100; 59-3 at 5. Thereafter, Royal Cup investigated Lowe's
allegations, interviewed Bishop about the alleged conduct, and although Royal Cup
found Bishop's denials credible, "the Company nevertheless re-issued the anti-
harassment policy to him, retrained him on it, and emphasized that the Company has
a zero tolerance policy for harassment." Doc. 59-3 at 5. Moreover, Royal Cup says
that it "has not received any further reports of alleged misconduct regarding Bishop
from Ms. Lowe or any other employees," *id.* at 5, which Lowe does not dispute, *see*
doc. 51-2 at 24; *see also* docs. 1; 59-1 at 1–38; 69. Royal Cup thus took "adequate"
steps to respond to and remedy the situation. And "if the undisputed evidence shows
that the employer, as soon as it was practical to do so after learning of the conduct,
took steps to stop the tortious conduct and *the tortious conduct stopped,* the steps
taken by the employer were adequate, as a matter of law." *Potts*, 604 So. 2d at 401
(emphasis in original). Accordingly, Lowe's invasion of privacy claim fails.

**2.**

Next, Lowe claims that Bishop's conduct "was extreme, outrageous, and beyond the boundaries of decency in a civilized society, and it proximately caused . . . Lowe, to suffer great emotional distress and trauma." Doc. 1 at 9. She again adds that Royal Cup knowingly refused to address his behavior. *Id.* "[T]he tort of outrage is viable only when the conduct is 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Ex parte Bole*, 103 So. 3d 40, 53 (Ala. 2012) (quotation omitted). To recover, a plaintiff must show "that the defendant's conduct '(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'" *Id.* at 52 (citation and quotation omitted). Alabama courts have recognized the tort of outrage in only three contexts: (1) "wrongful conduct in the family-burial context," (2) "barbaric methods employed to coerce an insurance settlement," and (3) "egregious sexual harassment." *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011) (citing *Busby*, 551 So. 2d 322).

Royal Cup contends that Lowe fails to allege facts that rise to the level of actionable outrage. Doc. 58 at 31. Lowe, however, argues that this case factually mirrors *Busby*, where the Alabama Supreme Court found that a jury could reasonably determine that the perpetrator's conduct was sufficiently egregious to

support the tort of outrageous conduct.[5] 551 So. 2d at 324. What constitutes "egregious" sexual harassment is not clearly defined, and the assessment "seems to be one of degree, frequency, and intensity." *Thornton v. Flavor House Prod., Inc.*, 2008 WL 5328492, at *18 (M.D. Ala. Dec. 19, 2008) (citing *Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1438 (M.D. Ala. 1996)). The court does not have to resolve whether Bishop's alleged conduct rises to the requisite level of egregiousness under Alabama law. Like her invasion of privacy claim, the outrage claim fails because Royal Cup took adequate steps to remedy any inappropriate behavior.[6] *See supra* part III.B.1.

### 3.

Finally, Lowe pleads that, "[b]y failing to have and/or to enforce a sexual harassment policy and by failing to conduct effective sexual harassment training, [Royal Cup] negligently and/or maliciously failed to train Bishop adequately on the

---

[5] In *Busby*, the perpetrator had invited the plaintiffs to swim nude with him, told them he would "put a stick on their machines" so that they could masturbate while working, communicated his wish that plaintiffs come to work braless and with less clothing, told one employee that he could "fill her pants in nine months for her" if she would give him 30 minutes, pretended to pinch one plaintiff's breasts with pliers and his hands, asked one plaintiff to accompany him into the restroom because he was tired, told one plaintiff that her nipples were as large as another employee's breasts, attempted to follow a plaintiff into the restroom and said that he was going to help her, followed one of the plaintiffs one night, openly stared at plaintiffs' sexual anatomy, and put his arm around plaintiffs, grabbed their arms, and stroked their necks. 551 So. 2d at 324.

[6] *See Potts*, 604 So. 2d at 40 ("[I]f the undisputed evidence shows that the employer, as soon as it was practical to do so after learning of the conduct, took steps to stop the tortious conduct and *the tortious conduct stopped,* the steps taken by the employer were adequate, as a matter of law.") (emphasis in original).

subject of sexual harassment which proximately caused . . . [Lowe's] harassment."
Doc. 1 at 10. Moreover, Lowe alleges that Royal Cup "negligently and/or
maliciously failed to terminate Bishop after receiving actual and constructive notice
of his harassment of . . . Lowe and/or his proclivity for harassing female employees
which proximately caused Bishop's continued harassment." *Id.*

"[I]mplicit in the tort of negligent hiring, retention, training, and supervision
is the concept that, as a consequence of the employee's incompetence, the employee
committed some sort of act, wrongdoing, or tort that *caused* the plaintiff's injury."
*Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 305 (Ala. 2010). The facts in this case
are sufficient for Lowe to maintain an invasion of privacy claim against Bishop, who
is not a defendant in this case.[7] But, "[i]n the master and servant relationship, the

---

[7] In *Busby*, a supervisor engaged in severe and pervasive sexual harassment including
"obscene and sexually suggestive remarks, gestures, and propositions, as well as physical contact
with the plaintiffs." *Mills v. Wex-Tex Indus., Inc.*, 991 F. Supp. 1370, 1384 (M.D. Ala. 1997) (citing
*Busby*, 551 So. 2d at 324). The Alabama Supreme Court found that a "jury could reasonably
determine from this evidence that [the supervisor] pried or intruded into the plaintiffs' sex lives in
an offensive or objectionable manner and thereby invaded their right of privacy." *Busby*, 551 So.
2d at 324. Moreover, in *Mills*, the Middle District of Alabama found sufficient evidence of privacy
intrusion or sexual harassment to survive summary judgment where defendant "grabbed
[plaintiff's] breasts and buttocks, pinched her, tried to pull her into his office, and pinned her
against the wall and tried to kiss her. In addition, [defendant] repeatedly sent [plaintiff] suggestive
notes, called her at work and at home, and visited her residence." 991 F. Supp. at 1384.
    Similarly, Lowe presents enough evidence for a jury to conclude that Bishop engaged in
severe and pervasive sexual harassment such that he objectionably intruded into her privacy.
Allegedly, Bishop made comments about making an "oreo" sandwich out of Lowe, another
African American female employee, and himself. *See* docs. 59-2 at 100; 59-3 at 5. On another
occasion Bishop asked Lowe if she liked "white meat" "in [her]." Doc. 59-2 at 100. Bishop was
also "touchy feeling with you, like he—he always had to touch you, stand behind you." *Id.*
Additionally, Bishop would leer at Lowe, ask her how her hair looked when it was down, and stare
at her when she was bending over, looking at her breasts and between her legs. Doc. 59-1 at 24.
Such allegations are enough to maintain an invasion of privacy claim against Bishop.

master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him." *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 987 (Ala. 1999) (quoting *Thompson v. Havard*, 235 So.2d 853, 858 (Ala. 1970)). Here, however, when Royal Cup learned of the allegations against Bishop, it responded appropriately by investigating the alleged conduct. Doc. 59-3 at 5. Lowe has not alleged any deficiency in the investigation. *See generally* docs. 1; 69. Royal Cup found Bishop's denials credible but nonetheless retrained him on its anti-harassment policy and emphasized its "zero tolerance policy for harassment."[8] Doc. 59-3 at 5. And Lowe admits that Bishop has not touched or said anything to her since the report. Doc. 59-1 at 25. Moreover, "Royal Cup has not received any further reports of alleged misconduct about Bishop from Ms. Lowe or any other employees," doc. 59-3 at 5, a contention Lowe does not dispute, *see* doc. 51-2 at 24; *see also* docs. 1; 59-1 at 1–

---

[8] The retraining, which Lowe does not refute, belies her contention that Royal Cup failed to conduct effective sexual harassment training. To the extent Lowe is claiming Royal Cup failed to sufficiently train Bishop prior to her complaint, while it is prudent to train employees on sexual harassment, the court is not aware of any caselaw holding that training is required by law, and Lowe does not cite any such authority. The law requires only that Royal Cup have a policy and that it effectively enforces it. And while there is no evidence before the court regarding the existence or extent of Royal Cup's sexual harassment training during employee orientation, Royal Cup does have a policy on sexual harassment in its Employee Handbook. Doc. 59-3 at 108–09. The policy outlines a "zero tolerance" policy regarding unlawful employee harassment and prohibits sexual harassment, including making unwelcome sexual advances and requests for sexual favors, making offensive or sexually oriented statements, touching another's body, violating personal space, leering and staring at coworkers, and sharing suggestive photos. *Id.* The Employee Handbook also lays out its Complaint Procedure for harassment, which allows employees to "bypass" their supervisors should they deem that necessary. *Id.* at 110

38; 69. Thus, Royal Cup took "adequate" steps to respond to and remedy the situation, *see Potts*, 604 So. 2d at 401, and the negligent retention, supervision, and training claims fail as a result.

## IV.

For the aforementioned reasons, Royal Cup's motion for summary judgment, doc. 57, is due to be granted. The court will enter an appropriate final order.

**DONE** the 2nd day of April, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE